Deibler *v.* The Chas. H. Elliott Co., Appellant.

Argued April 17, 1951. Before STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Henry S. Drinker,* with him *Francis Hopkinson,* and *Drinker, Biddle & Reath,* for appellants.

*Philip C. Herr,* for appellee.

OPINION BY MR. JUSTICE JONES, June 27, 1951:

This appeal is from a decree in equity ordering the defendant, Harry V. Elliott, to deliver to the plaintiff, Mark T. Deibler, 828 shares of stock in the defendant company (a Delaware corporation) registered in the name of Harry V. Elliott with attached executed power of attorney authorizing the sale, assignment and transfer of the certificates for such shares, and permanently enjoining Elliott, the pledgee of the stock, from voting the shares at any meeting of the stockholders of the company. The appeal is joint by the defendants indicated who claim that the purpose of the pledge has not yet been served and that Harry V. Elliott is entitled to possession of the stock for the remainder of his lifetime and the right to vote it.

The question involved was raised in the court below on preliminary objections by the plaintiff, under Equity Rule 55, to the defendants' answer to the bill of complaint, including new matter. The objections do not seem to fit any of the seven specifications in Equity Rule 48 adopted by reference in Rule 55. All of the material facts appear by the pleadings; none is in dispute. The matter was apparently submitted for the court's final disposition on bill and answer. At

least the learned court below evidently so apprehended, as indicated by its entry of the definitive decree for the plaintiff on the merits merely upon preliminary objections. In any event, the controversy involves no more than a question of law which requires for its solution the proper interpretation of a written agreement whose provisions need be recited with considerable detail.

In 1938, Elliott, then sixty years old, was president of the defendant company for which he had actively worked all of his adult life; he was the owner of 1937 shares of the common stock of the company which was in excess of 80% of its total outstanding stock. Desiring to increase the interest of two employees, namely, Deibler, the plaintiff, and W. Alfred Streamer, in the company by enabling them to purchase a controlling interest in the stock of the company at a low figure and upon convenient terms, Elliott entered into a written agreement with Deibler and Streamer to that end on March 25, 1938.

Thereby, Elliott agreed to sell 828 shares of his stock to Deibler at $5 per share for a total of $4140 to be paid in installments of specified amounts at the end of each three-month period thereafter until paid in full. Deibler completed payment in full for his stock in January 1943. Elliott likewise agreed by the writing to sell to Streamer 552 shares of his stock at the same price ($5) per share for a total of $2760 to be paid for similarly in installments. Deibler and Streamer, on their part, severally agreed to pay Elliott the sums respectively owing for the stock which had a then actual value of $92.38 per share and is now worth $120 per share. The agreement further provided that the shares so sold by Elliott to Deibler and Streamer would be transferred to them and would then "immediately be delivered by Deibler and Streamer to Elliott, together with powers of attorney in blank

for the transfer of said shares to be held by Elliott as collateral security for the performance by Deibler and Streamer of the terms of this agreement." From the time of the execution of the agreement in 1938 until 1950, Elliott voted the pledged stock without question or complaint from either Deibler or Streamer; and all of the shares so sold to them have at all times been, and still are, registered in the name of Harry V. Elliott.

On February 28, 1950, Deibler filed his bill of complaint in the instant suit praying (1) that The Chas. H. Elliott Co. and Harry V. Elliott, individually and as president, and W. Alfred Streamer, secretary of the corporation, be directed to cancel the 828 shares of stock in the company registered in the name of Harry V. Elliott and re-register such shares in the name of Deibler and turn them over to him, (2) that an injunction issue enjoining and restraining Elliott from voting such shares, and (3) for other and further relief. The final decree now under review resulted. Neither Streamer's stock nor Elliott's right to vote it is in any way involved in this proceeding.

One of the most important terms of the agreement is that Elliott was to be continued in the employ of the corporation *for life* at a salary of $135 per week. As the agreement provided,—"To secure the performance on their part of this agreement Deibler and Streamer hereby irrevocably vest in Elliott *for the term of his life* the right to vote said 1380 shares of stock at all meetings of the Corporation in such manner and for such purposes as Elliott may desire [Emphasis supplied]. Deibler and Streamer shall be entitled to receive all dividends on the shares purchased by them .... At the death of Elliott his personal representative shall, subject to the payment of any balance of the purchase price which may then be due, deliver to Deibler and Streamer the number of shares purchased by them respectively." Incidentally, an average yearly

dividend of approximately $5.50 per share was paid on the stock from 1942 to 1949 for a total of $36,822 in dividends to Deibler on his 828 shares.

The agreement covered the possibility that Deibler or Streamer or both might fail to pay in full for their stock purchases. For such a contingency the agreement provided that Elliott "shall have the option either (a) to return to the party in default all payments theretofore made by him," whereupon the shares of the defaulting party were to revert to and become the absolute property of Elliott, "or (b) Elliott may consider the party in default as having completed the purchase of such number of shares as the payments theretofore made by such party in default would purchase at $5. per share, and thereupon such number of shares *shall be held by Elliott under the terms of this agreement,* and the remainder of the shares originally purchased by such party shall revert to and become the absolute property of Elliott . . . ." (Emphasis supplied).

Should either Deibler or Streamer die before making payment in full for his stock, the agreement provided that, in such event, the survivor would be entitled to take over the stock of the decedent upon the same terms and should pay to the deceased's estate the amount theretofore paid by him on account of his shares. If thereafter the survivor should predecease Elliott, the latter was to "have the right . . . to pay to [the deceased survivor's] estate the full amount theretofore paid on account of the purchase price of said shares . . ." whereupon Elliott would become the absolute owner of all of the shares sold to Deibler and Streamer. It is not entirely clear from the 1938 agreement what disposition was to be made of the stock in the event Deibler or Streamer (or either of them) died after making payment in full for their shares but before Elliott died. However, no such circumstance is

involved in the present controversy. Deibler, Streamer and Elliott, all are living. Moreover, the subsequent agreement, to which reference will hereafter be made, provides for the company's acquisition of Deibler's and Streamer's shares, respectively, upon the death of either of them. The opinion for the court en banc makes the statement that "After full payment of said stock by Deibler and Streamer under all three agreements, Elliott had no right to re-acquire the same. See Exhibit A." Exhibit A, to which reference is thus made, is the 1938 contract; and the three agreements referred to embrace the 1938 contract and two later agreements to be mentioned hereinafter.

The second of the three agreements above mentioned was entered into on April 11, 1946, between Deibler, Streamer and The Chas. H. Elliott Co. for which Harry V. Elliott, president, signed. The purpose of this agreement was to enable the company, upon the death of either Deibler or Streamer, to purchase "a part or all of the stock of such decedent." To that end, the agreement provided that separate insurance policies in the amount of $100,000 each on the lives of Deibler and Streamer should be taken out at company expense with the company as beneficiary. It was further provided that "upon the death of either [Deibler or Streamer] 552 shares . . . held by such decedent shall forthwith be sold to the Company for the price of $100 per share," the company paying for such shares from the proceeds of the policy or policies of life insurance. The residue of the proceeds of the policies was to become the absolute property of the company. "The certificates for the shares of stock owned by Deibler and Streamer [were to] be endorsed with the following legend: 'The shares represented by this certificate are held and are transferable only subject to the terms of a certain agreement dated 11th of April, 1946, between The Chas. H. Elliott Co., Mark T. Deibler and W. Al-

fred Streamer.' " And, finally, it was provided that, upon Deibler's death, his shares in excess of 552 would be "transferable free and clear of the terms of this agreement and, the Company, at the request of his personal representatives, agrees to issue a certificate for such shares without notation thereon of the legend. . . ."

The third of the above-mentioned agreements was entered into on February 24, 1947, between The Chas. H. Elliott Co. and Deibler, Streamer and Charles H. Elliott, 2nd (designated "Stockholders"), and Harry V. Elliott. The stated purpose of this agreement was to provide "for the care of [Elliott's] wife for her lifetime subsequent to his death and similar provision . . . for him in the event of his disability." This agreement affirmed that Elliott was to remain in the employ of the company for life, even during total disability, at a salary of $135 per week. Upon his death, an equivalent payment was to be made to his wife for her life.

The learned court below construed Deibler's pledge of stock to Elliott as being solely for the purpose of securing payment of the purchase price and, since the stock had been paid for in full, the court held that Elliott's retention of the stock reposed in him no more than a dry trust or naked title and that, consequently, the pledge was terminable by a court of equity upon application of the beneficial owner. With respect to the voting rights appurtenant to the stock, the lower court determined the law to be that a proxy, although specified as being irrevocable, is revocable at will unless the power is coupled with an interest and that an interest capable of rendering a proxy irrevocable is an interest in the stock itself as distinguished from an interest in the corporation generally or in the results to be accomplished or secured by an exercise of the voting privilege. Having so construed the purpose of

the pledge, the court below concluded that Elliott's interest was not in the stock itself and ordered him to transfer the 828 shares to Deibler and permanently enjoined him from voting the stock.

In answer to the contention adopted by the learned court below that the pledge of the stock was merely to secure payment of the purchase price, the appellants pertinently point to the plain words of the agreement that the shares were "to be held by Elliott as collateral security for the performance by Deibler and Streamer of the *terms of this agreement*" (Emphasis supplied). Among such terms were (1) the undertaking of Deibler and Streamer to pay the purchase price, (2) that Elliott would be employed by the corporation *for his lifetime* at a salary of $135 per week and (3) that Elliott would have the voting right to the stock in question for life. The first of these terms, viz., payment of the purchase price, has alone been met. The other two conditions have not been fulfilled. Only by Elliott's continued corporate control through his retention of the right to vote the stock during his life can he be assured of the fulfillment of the provisions for his employment by the corporation for life at the specified salary. That the parties to the agreement so understood and intended accordingly is further confirmed by the fact that the sole provision of the agreement as to final delivery of the shares to Deibler and Streamer is that *"At the death of Elliott* his personal representative shall . . . deliver to Deibler and Streamer the number of shares purchased by them respectively" (Emphasis supplied). Obviously, Elliott was to retain possession of the stock for his lifetime. Nor is it any answer for Deibler to say that his stock proxy to Elliott for the term of the latter's life is against public policy and can, therefore, be ignored. The fulfillment of that provision is a condition precedent to the complete vesting in Deibler of the right to possession of

the stock and the voting privileges attaching thereto. If Deibler repudiates that condition, then he is without right to claim the stock. As the Restatement, Contracts, §607, puts it,—". . . where any part of a bilateral bargain is illegal, no promise can be enforced unless not only that promise is legal but a corresponding legal promise is, by the terms of the bargain, apportioned as consideration therefor, nor even in that case if the illegal portion of the bargain is an essential part of it." Or, as stated in *Comment a* to the above-cited section of the Restatement,— "If . . . a promise is made by A to do something lawful while B promises to do two things, one lawful and one unlawful, there can be no recovery on either side." Judge Learned HAND of the Court of Appeals for the Second Circuit well expressed the thought when, in following §607 of the Restatement, Contracts, he said, ". . . a promisor is excused from performance when a counter promise which is the consideration for his own promise is repudiated for illegality": *Stokes & Smith Co. v. Transparent-Wrap Mach. Corporation,* 156 F. 2d 198, 203 (1946). See also *Shannon's Estate,* 289 Pa. 280, 284, 137 A. 251; and *Kuhn v. Buhl,* 251 Pa. 348, 373, 96 A. 977.

Moreover, the proxy to Elliott was not revocable. It was coupled with an interest. The legality of an agreement concerning the voting rights of corporate stock is to be adjudged by the law of the State of incorporation which in this instance is Delaware: see Restatement, Conflict of Laws, §§ 182, 183, *Comment a; Ringling v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.,* 49 A. 2d 603, 607 (Del.). The learned court below relied on the case of *In re Chilson,* 19 Del. Ch. 398, 168 A. 82 (1933), as authority for the proposition that the interest of a proxy-holder necessary to make the proxy irrevocable must be an interest in the stock itself. But, in *Ringling v. Ringling Bros.-*

*Barnum & Bailey Combined Shows, Inc.,* supra, the Delaware Court of Chancery took occasion to point out that "In re Chilson . . . actually turned on the question of the existence of an irrevocable proxy in the absence of a property interest in the holder." Inasmuch as the *Chilson* case did not involve any sort of an interest, what was there said in such respect was plainly a dictum which was later disapproved in the *Ringling* case, supra. We know of no decision in Delaware, nor has any been cited, which holds that the interest necessary to make a proxy irrevocable must be in the stock itself rather than a general interest in the corporation or in what the exercise of the proxy may accomplish or secure. The rule in general is that the interest which will support an irrevocable proxy need not be in the stock itself but any property interest in the proxy-holder for which the stock is held as security. See Annotation in 159 A.L.R. at p. 307. In the instant case Elliott is the pledgee of stock pledged to secure performance of the agreement whereby the stock was acquired by the pledgor. Such an interest makes the proxy irrevocable.

Decree reversed, at appellee's costs, with directions to dismiss the bill.