Michael WAREHIME, Appellant,

v.

John A. WAREHIME, Appellee.
(Two Cases.)

Superior Court of Pennsylvania.

Argued May 19, 1998.
Filed Dec. 2, 1998.
Reargument Denied Feb. 9, 1999.

Alfred W. Putnam, Jr., Philadelphia, for appellant.

William C. Adrian Boyle, York, and Matthew J. Siembieda, Philadelphia, for appellee.

Before CAVANAUGH, POPOVICH and BROSKY, JJ.

CAVANAUGH, J.:

These appeals concern the future control of the Hanover Foods Corporation ("HFC"). Michael Warehime appeals from the denial of his motion for preliminary injunction, through which he sought to enjoin certain actions of appellee John Warehime and HFC's Board of Directors that would perpetuate John's control of HFC. We must determine whether appellee John Warehime, the voting trustee of the Warehime voting trust, breached his fiduciary duty to the beneficiaries of that trust. As we conclude that this duty was breached, we reverse the orders entered by the trial court and remand for further proceedings.

The pertinent facts, as found by the trial court, are as follows. Alan Warehime is the father of appellee John Warehime, appellant Michael Warehime and Sally Warehime Yelland. He served as chairman and chief executive officer of Hanover Foods Corporation

("HFC") from 1956 to 1989. On May 26, 1989, by appointment of Alan Warehime, John Warehime became chairman and CEO of HFC.

The Warehime family established two voting trusts, dated April 5, 1988 and December 1, 1988, which controlled a majority of the voting stock (Class B) of HFC. The first trust was established by Alan Warehime and his three children; it controls 199,496 shares of HFC Class B voting stock.[1] The second trust was established by Alan Warehime and five of his grandchildren; it controls 15,025 shares of HFC Class B voting stock.[2] Until his death on March 24, 1990, Alan Warehime was the sole voting trustee of each voting trust. Thereafter, John Warehime, in accordance with Alan Warehime's designation, became the sole voting trustee of each trust. During his life, the voting trusts gave Alan Warehime complete control over HFC. By virtue of Alan Warehime's designation of John Warehime as sole successor trustee, he succeeded to and possessed the same power to control the voting trust and, consequently, HFC. The voting trusts expire in 1998, ten years after their respective creation.[3]

When the first trust expires in April of 1998, both Michael Warehime and Sally Warehime Yelland want to remove John Warehime as chairman of HFC. Although Michael Warehime would like to succeed John Warehime in this position, it is claimed that neither he nor the other plaintiffs have developed any future plans for the company or identified the management they intend to install. This uncertainty is said to have caused instability within the company and uncertainty about its future. To compound matters, John Warehime, Michael Warehime and Sally Warehime Yelland, do not communicate with each other and have not spoken in over three years.[4]

In late 1996, an Independent Directors Committee was formed by several of HFC's directors.[5] It was formed for the primary purpose of considering strategic alternatives for HFC in light of the pending expiration of the voting trust agreements in 1998. The decision to form this committee was made solely by its members without advice or input from counsel or John Warehime. As evidence of the directors' independence, in face of the fact that HFC's entire Board of Directors was elected solely by John Ware-

1. Of the 199,496 shares controlled by this trust, 115,994 shares are beneficially owned by the estate of Alan Warehime, 36,172 shares are beneficially owned by John Warehime, 35,116 shares are beneficially owned by Sally Warehime Yelland and 12,215 shares are beneficially owned by Michael Warehime. By virtue of this ownership, Michael Warehime and Sally Warehime Yelland each have a minority beneficial interest in the HFC stock controlled by the voting trusts. We further note, with respect to the shares beneficially owned by the estate of Alan Warehime, that John, Michael and Sally serve as three of the estate's five executors.

2. Of the 15,025 shares controlled by the second trust, Alan Warehime's five grandchildren each beneficially own 3,005 shares.

3. We realize, of course, that the expiration of the April 5, 1988 trust (which controls the bulk of the voting stock) predates our disposition of this appeal. However, in the interest of clarity, we adopt the same time frame and tense as prevailed when the case was in the trial court. The consequences of our adjudication are to be considered immediate and unaffected by the temporal disparity inherent in the progress of litigation.

4. This litigation is laced with charges and recriminations concerning the acts, threatened actions or inaction on the part of John and Michael

Warehime. Since they are irrelevant to the legal issues that are presently determinative, we do not consider these contentions, nor do we presently reiterate them.

5. In 1994, John Warehime voted all of the voting trust shares in favor of a proposal to eliminate cumulative voting in the election of HFC's directors. Prior to this action, those shareholders holding voting stock outside of the trust were able to elect three members of the board of directors. Following the passage of the proposal, these shareholders were unable to elect any directors. John Warehime maintained that this action was necessary due to the disruptive behavior of Michael Warehime. All of the shares voted in favor of the proposal were voted by John Warehime. The net result of this action was that John Warehime, through the voting trust, was able to elect all of the board members.

We note that appellant has not directly challenged the elimination of cumulative voting in this appeal. Had the issue been properly preserved, however, the propriety of this action would be subject to serious question. Our skepticism is based on the same reasoning we set forth *infra*, in discussing John's voting the trust shares in favor of the proposed amendments to HFC's Articles of Incorporation.

hime, the trial court noted that the Board rejected proposals made by John Warehime on numerous occasions and will only continue to support John Warehime as chairman of HFC if he continues to perform well.

In considering the alternatives open to HFC, the Committee retained several firms and individuals to evaluate the company, including its employees, financial information, production facilities and business plan. This review acknowledged that HFC was a well-managed company and that it was equal or superior to its peer companies. It went on to recommend, however, that in order for HFC to sustain its business strategy of being the low-cost producer, it would require approximately $30 million in new capital. Because of the uncertainty raised by the 1998 expiration of the voting trusts, raising this capital would likely prove difficult, at least until HFC's governance structure stabilized. It was felt that if the present uncertainty would persist, HFC's business would likely deteriorate and it would be impossible to conduct business in a manner beneficial to the long-term interests of the company.

In light of this situation, the Committee considered three strategic alternatives for the future of HFC: (1) do nothing and allow the voting trust to expire; (2) sell the company or a control position in the company; or (3) adopt an amendment and restatement to HFC's Articles of Incorporation to provide a stable governance structure. Because of the substantial problems which would be caused by the persistence of an unstable governance structure, the Committee chose the third option.

The proposed amendments to HFC's Articles of Incorporation permitted the issuance of 10,000 shares of Series C Convertible Preferred Stock to be issued to the HFC 401(k) plan, provided that the majority of the trustees of that plan are "disinterested directors"

of HFC as defined in § 1715 of the Pennsylvania Business Corporation Law ("BCL"). *See* 15 Pa.C.S.A. §1715(e). In the event of a dispute among *any* of the five members of the Warehime family over the management of HFC, the amendments provided a method for resolution of such a dispute. The trial court summarized this mechanism:

> In the event of a dispute among members of the Warehime family with respect to the election of directors or other related matters during the five years after the issuance of the stock, the Series C would be entitled to 35 votes per share. If there is no such dispute, the Series C shares are non-voting. The Series C Stock is convertible into Class A common stock.

The court also noted that the Series C shares must be voted by "disinterested directors" who have no relationship to John Warehime (who may not vote Series C shares) and who must vote as fiduciaries of the 401(k) plan. Finally, the court noted that the 350,000 votes the Series C shares control can be outvoted by approximately 80% of Class B stock and a majority of the Class A stock.[6] The outside consultants retained by the Committee opined that the amendments would provide a stable governance structure for the company and would permit the implementation of HFC's capital raising plan. The Board of Directors was further advised that adoption of the amendments would be consistent with their fiduciary duties under the Pennsylvania BCL. The factual findings of the trial court notwithstanding, the fact of John Warehime's control over the election of the Board of Directors, and the application of this mechanism clearly serves to perpetuate the total control of John Warehime over the corporation.

The shareholders of HFC were given formal notice of the proposed amendments. In response, Michael Warehime and several oth-

---

**6.** We note that under the 1988 HFC Charter Amendment, the Board of Directors has authority to issue 800,000 shares of Class A stock, 880,000 shares of Class B stock and 120,000 shares of preferred stock. At the time the amendments creating the Series C stock were proposed, only 292,170 shares of Class A stock were outstanding, only 427,133 shares of Class B stock were outstanding, and only 15,044 shares of preferred stock were outstanding. As such, the number of Class C shares created and the possible subsequent conversion into an equal number of Class A shares were within the total number of shares authorized by the Charter.

We also note that although Class A shares are nonvoting, where the Class C shares are entitled to vote, the Class A shares are accorded one-tenth of a vote per share.

er shareholders immediately moved for a preliminary injunction, requesting that John Warehime be prohibited from voting the shares in the voting trusts in favor of the proposal. They maintained that the amendments were merely a device to extend John Warehime's control beyond the termination of the voting trusts to the detriment of the voting trust beneficiaries and the other shareholders of HFC. Following a hearing on the matter, the trial court denied the requested relief. The day after this ruling, John Warehime convened a meeting and voted all of the voting trust shares in favor of the proposed amendments. John Warehime was the only shareholder at the meeting and the only shareholder to vote for the amendments. This appeal followed.

Our scope of review of a trial court's grant or denial of injunctive relief is limited. On appeal, this court "is restricted to whether there were any apparently reasonable ground[s] for the action taken by the court below." Moreover, unless the record shows that the trial court's ruling was palpably erroneous, a misapplication of law, or a manifest abuse of discretion, this court will affirm the lower court's decision.

\* \* \*

Injunctive relief, in particular a preliminary injunction, is "considered an extraordinary remedy and may only be granted if the plaintiff has established a clear right to the relief sought." In Pennsylvania, a preliminary injunction will be granted only where a party can demonstrate certain prerequisites. There must exist (1) a threat of immediate and irreparable harm, that cannot be remedied by damages; (2) the injury that would result by denying the injunction must be greater than the injury by granting the equitable relief; and (3) the grant of the injunction must properly restore the parties to the situation as it existed prior to the alleged wrongful conduct. Underlying these three requirements, a court, sitting in equity, will not grant an injunction unless the conduct

sought to be enjoined is actionable and an injunction can, in fact, restrict the conduct. *Schaeffer v. Frey*, 403 Pa.Super. 560, 589 A.2d 752, 754–55 (Pa.Super.1991) (citations omitted).

The powers and duties of a voting trustee have been summarized as follows:

The powers and duties of the trustees are to be determined from the trust agreement as a whole, not reading one provision to nullify another and thus defeat the trust.

\* \* \*

It is a breach of trust to vote contrary to its terms, or for personal advantage outside of and contrary to its purpose. It has been held that voting trustees could not elect themselves or others as directors for terms of office that would outlast the duration of the voting trust.

\* \* \*

The trustees have voting powers and such as are incident to their trust, but are not managers of the corporation, which is the function of the directors elected by their votes. Nor does the creation of the voting trust give the trustee the power to destroy the beneficial ownership interests in any manner.

\* \* \*

Voting trustees should be held to adhere to the usual fiduciary principles of a trust. The trustees may deal with the depositing stockholders, but do so under the disabilities of trustees generally.

5 Fletcher, **Cyclopedia Corp.** §2091.1, at 481–82 (1996). See also Bogert, **Trusts & Trustees** §252, at 320 (2nd Ed. Rev.1992)(general rules of trust law apply to voting trusts).[7]

A trustee owes a duty of loyalty to the beneficiaries of the trust. This duty is summarized:

Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete

---

**7.** Due to the paucity of direct decisional authority in Pennsylvania, we have placed substantial

reliance on accepted treatises.

loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons.

\* \* \*

A trustee's duty of loyalty has been described as inherent in the trust relationship. This duty is sometimes stated as the rule of undivided loyalty, or simply the loyalty rule. Though sometimes it has been difficult for the courts to determine whether the rule should be applied under the circumstances of the particular case, nevertheless the loyalty rule may be simply stated:

> A trustee is under a duty to the beneficiary of the trust to administer the trust solely in the interest of the beneficiary. The trustee must exclude all self-interest, as well as the interest of a third party, in his administration of the trust solely for the benefit of the beneficiary. The trustee must not place himself in a position where his own interests or that of another enters into conflict, or may possibly conflict, with the interest of the trust or its beneficiary. Put another way, the trustee may not enter into a transaction or take or continue in a position in which his personal interest or the interest of a third party is or becomes adverse to the interest of the beneficiary.

Bogert, **Trusts & Trustees** §543, at 217–18 (2 nd Ed. Rev.1993).[8] Moreover,

> Good faith on the part of the trustee is not a defense against a claim of disloyalty. The ignorance or innocence of the trustee is irrelevant in deciding whether the act was disloyal, although it may be of some influence in determining the relief granted the beneficiary.

> It is not necessary that the trustee shall have gained from the transaction in order to find that it is disloyal. If the dealing presented conflict of interest and consequent temptation to the trustee, it will be voided at the option of the beneficiary, regardless of gain or loss to the trustee.

\* \* \*

> With respect to self dealing transactions the rule of undivided loyalty has been applied primarily to deter trustees from the temptation to favor themselves individually over their beneficiaries. For this reason a defense that the trustee acted in good faith, or that fair value was paid, or that the trust incurred no loss (or that actual benefit accrued to the trust) has not been allowed by the courts.

*Id.* at 247–48.

In addition to these general principles, our examination of Pennsylvania law uncovered but a single case dealing with the fiduciary obligation of a voting trustee to the trust beneficiaries. In *Moore v. Caldwell*, 62 Pa. D & C 479 (1947), Lewis, J., writing for the Philadelphia County Orphans Court, examined the conduct and duties of two voting trustees. In *Moore*, plaintiffs petitioned the trial court to remove one or two of the three voting trustees or, alternatively, dissolve the trust. This relief was requested by plaintiffs based on their belief that J. Emott Caldwell, Jr., and his mother, Frances M. Caldwell, (who constituted a majority of the voting trustees and, thus, could control the voting of all the common stock) intended to use their voting power to elect a new board pledged to elect J. Emott Caldwell, Jr., president of the corporation. Plaintiffs alleged that this action constituted an enjoinable breach of trust because the Caldwells, as voting trustees, were using their voting power to promote their personal interest.

Following a hearing on plaintiffs' petition, the court found that J. Emott Caldwell, Jr. had abandoned his plan to become president of the corporation; and that he acted in good faith and not purely from personal interest, in that he believed there were deficiencies in the business that needed to be addressed. Finally, it found that there was no evidence that Frances Caldwell would use her voting power in support of her son's plan. Based on

---

8.  Similarly, The Restatement (Second) of Trusts states:

§ 170.  Duty of Loyalty

(1) The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.

these findings, the court denied plaintiff's petition, stating:

> As voting trustees, all three of the incumbents are trustees under the law, and are required to act in the interest of those whom they represent in a fiduciary capacity. This, however, does not negative action based upon discretion or best judgment; in fact, the use of sound discretion and judgment is an obligation imposed upon fiduciaries, and it undoubtedly was within the contemplation of the stockholders and certificate holders that the voting trustees having the power to elect the board of directors and thus to bring about a reorganization of the business, might, in the exercise of honest and reasonable discretion, feel themselves called upon so to act.
>
> Such a trustee cannot be impeached and removed for acting or proposing to act according to his or her best judgment, although that judgment might be questioned by the minority voting trustee or by the stockholders or by the executives of the corporation. As we have said, the voting trust was set up for the very purpose of giving power to a majority of three trustees to act, according to their information and judgment, for the best interests of the stockholders and the business. To justify the removal of such a trustee, there must be evidence of conduct exhibiting something more than what others may consider to be bad judgment; it must clearly appear that the trustee had been guilty of wrongful conduct – some disregard of his fiduciary obligation amounting to malfeasance.

*Moore* at 510–12.

The court, however, went on to state:

We have carefully considered the opinion of our Supreme Court in *Bryson v. Wood*, 187 Pa. 366, 41 A. 473. It is true that a voting trusteeship is by appointment of the stockholders and certificate holders, and the Supreme Court in the *Bryson* case (which did not involve a voting trust) said that a trustee who has lost the confidence of the fiduciaries who appointed him should not continue in office. The Supreme Court also stated that it is not material that the trustee was innocent of actual misfeasance; that his conduct ought to meet the approval of those whose interests are to be protected, for his sole duty is to them.

*Id.* at 504.

■ We interpret the decision in *Moore* to be consistent with the general principles governing trusts outlined *supra*. In *Moore*, one of the voting trustees proposed, but never carried forward, a plan to make himself the president of the corporation. The court found this action was taken in good faith and, as such, did not justify the extraordinary remedy of removing the voting trustee or, alternatively, dissolving the trust. It is, nonetheless, clear from the court's discussion of *Bryson* that a trustee's sole duty is to the beneficiaries of the trust and that his conduct ought to meet with their approval. To the extent that the trustee votes his or her self-interest to the exclusion of the other beneficiaries, he has acted in breach of his duty of trust. Moreover, it is irrelevant whether the trustee's motive is benign or his action undertaken in good faith.[9]

■ We necessarily believe, consistent with the general principles applicable to trusts outlined *supra*, that while removal of a trustee may only be justified where he is

---

9. We note:

The public policy reasons underlying the duty of loyalty are several. A trustee is expected to act on behalf of the beneficiary with an independent and disinterested judgment. If his individual interest is injected into trust matters he cannot remain independent or disinterested. It is not possible for any person to act fairly in the same transaction on behalf of himself and in the interest of the trust beneficiary. It is only human that he will tend to favor his individual interest, whether consciously or unconsciously, over that of the beneficiary. Furthermore, the confidential nature of the trust relationship lends itself to secrecy and concealment on the part of a trustee who may be tempted to exploit the trust. In addition, even though the trustee may render accounts to the beneficiary or to the court, the beneficiary's chance of discovering the disloyal act is remote; thus, as a practical matter, the beneficiary may have no opportunity to object or to obtain relief.

Bogert, Trusts & Trustees § 543, at 227 (2 nd Ed. Rev.1993).

found guilty of some wrongful conduct (and not just bad judgment) that an action, though taken in good faith, which runs contrary to the interests of the beneficiary or in the self-interest of the trustee, is a violation of the duty of loyalty and is voidable at the option of the beneficiary. As the defendant in *Moore* never carried forward his plan to make himself president of the corporation, the court was never faced with the question of voiding defendant's action.

Our research has further uncovered *In Re Flagg's Estate*, 365 Pa. 82, 73 A.2d 411 (1950) which delineates an important caveat to a trustee's duty of undivided loyalty to the trust beneficiary.[10] *Flagg* does not involve a voting trust, but the conflict of interest faced by the trustee is similar to the conflict in the present case. In *Flagg*, the beneficiaries of a testamentary trust petitioned to set aside redemptions of preferred stock, which were part of the trust estate, on the grounds that the trustees also controlled the redeeming corporation and thus were in violation of their duty of undivided loyalty. There was no evidence of fraud in the case, the trustees and the corporation acted in good faith in making the redemptions and the challenged action was within the provisions of the will. The trial court, nonetheless, set aside the contested transaction reasoning:

> In voting for the redemption, [the trustee] was bound to serve the best interests of the trust, and was also duty bound to serve the best interests of the corporation. He could not do both at once ... *the existence of the conflict of interest ipso facto disqualified him* from acting * * *Again, it is unnecessary to determine whether he was in fact influenced even to the slightest degree by any selfish motive in voting for redemption; *it is the conflict of interests rather than bad faith* which is the determinative factor.

*Flagg, supra* at 88, 73 A.2d at 415 (emphasis in original).

On appeal, the Supreme Court reversed, concluding that the intention of the testator in his will cannot be set aside in the absence of bad faith on the part of the trustee, even where a conflict of interest exists. The Court reasoned:

> The will shows that the testator had the conflict in mind when he made it and left it to be one of the conditions of his testamentary dispositions to be dealt with during administration. He knew the preferred stock was issued subject to redemption ... and he knew that by his bequest he was giving unrestricted voting powers in the corporation to his son who had been his partner.... The conferred right to exercise all these plenary powers of ownership necessarily modified or displaced the otherwise absolute limitation against self-dealing. This record shows that the conflict of interest did not disqualify the trustees; it shows that they acted in good faith in what they, acting as reasonable men thought was for the best interest of the trust.

> * * *

> [W]here the power, indeed duty, to engage in self-dealing is necessarily implied in the terms of the testator's will the valid exercise of that power will not be set aside by this court. We do not wish to impair the value of the rule against self-dealing when properly applied. Testamentary provisions must be given effect notwithstanding the existence of the self-dealing rule; it is not the abstract conflict but the administration that is decisive and administration is subject to the control of the court.

*Id.* at 89–92, 73 A.2d at 415–16.

■ Here, it is clear that the settlors of the Warehime Voting Trust contemplated and created an inherent conflict of interest for the voting trustee. The terms of the trust provided that the voting trustee would exercise a controlling interest in HFC and the settlors entered into the trust agreement with the knowledge that Alan Warehime, the designated trustee, was also the chairman and CEO of HFC. It is further clear from the record that the settlors were aware that John Warehime would succeed his father as

---

10. We note that neither the trial court nor the parties have cited *Flagg* or otherwise called our attention to its holding. A single reference to *Flagg* does appear in appellants' brief at p.35. This reference, however, only echoes the general principle that the trustee may only act in the interest of the beneficiary of the trust.

trustee as well as chairman and CEO of HFC.

With regard to the powers vested in the trustee, the agreement stated the settlors believed that it was in their and HFC's best interest to allow a single trustee to vote their shares and, thus, control the company. Not only did the settlors give the voting trustee a controlling interest in HFC, they conferred upon him virtually unrestricted voting powers. The trustee was vested with the authority to exercise all rights of every kind granted to the shareholders. The only limit placed upon the trustee was that "he exercise these rights in accordance with his own best judgment."

The trial court concluded, following hearings in the matter, that John Warehime voted the trust shares in favor of the proposed amendments in the good faith belief that they were in the best interest of all the shareholders of HFC, including the voting trust beneficiaries. It further concluded that the adoption of the proposed amendments benefited all shareholders because they created a stable governance structure which would allow the business to remain competitive and on a sound financial footing. The record supports these findings.

At first blush, it appears that under the rule of *Flagg*, the virtually unrestricted powers granted John Warehime as trustee would modify or displace his absolute duty of loyalty and the limitation against self-dealing. As the trial court found that John Warehime, as trustee, voted the shares held by the trust for the proposed amendments in the good faith exercise of his best judgment, it would appear that *Flagg* requires the conclusion that the adoption of the amendments were within the grant of power to the trustee and may not be set aside. However, for the reasons we now set forth, we believe that the rule announced in *Flagg* is inapplicable in this case and that *Flagg* is distinguishable on its facts.

In *Brown v. McLanahan*, 148 F.2d 703 (4th Cir.1945), which will be discussed more fully *infra*, the trustees of a voting trust which controlled a corporation, amended the company charter on the eve of the expiration of the trust. These amendments effectively altered the voting rights of the company's shareholders and allowed the trustees to retain control of the corporation after the expiration of the voting trust. With respect to the shareholders' voting rights, the court stated:

> While it is true that words of Article VII grant broad authority to alter capital stock in amount, classification and preference, this Article, when read in the light of equitable doctrines affecting trusts and in connection with Article X, cannot be considered to grant unlimited authority to the trustees. Certainly it should not be construed as a grant of authority to diminish so greatly the value of the stock. *Application of Bacon*, 287 N.Y. 1, 38 N.E.2d 105. It cannot be said that voting power lacks the quality of property meriting judicial protection. *Stokes v. Continental Trust Co.*, 186 N.Y. 285, 78 N.E. 1090, 12 L.R.A.,N.S., 969, 9 Ann.Cas. 738. *Cf. Miles v. Safe Deposit & Trust Co.*, 259 U.S. 247, 42 S.Ct. 483, 66 L.Ed. 923; *Thom v. Baltimore Trust Co.*, 158 Md. 352, 148 A. 234. The voting strength attaching to shares of stock is as much a property right as any element of dominion possessed by an owner of realty. *See, also,* **Rohrlich, Law and Practice of Corporate Control,** 27–28; **Frey, Shareholders' Preemptive Rights,** 38 Yale L.J., 563, 564; **Drinker, The Preemptive Right of Shareholders,** 43 Harvard L.Rev. 586.

*Brown* 148 F.2d at 708.[11]

We believe that the critical distinction between *Flagg* and the case at bar involves the issue of the fundamental alteration of nature of the corpus of the trust, or in other words, the diminution of the property rights held by the trust beneficiaries. *Flagg* involved a simple matter of administration of the trust—the exercise of the trustees' broad power to redeem shares of preferred stock. The trustees in *Flagg* were charged with providing income to the trust beneficiaries.

---

11. We note that the voting trust agreement in this case provided for a meeting of all voting trust beneficiaries on any matter affecting their rights and offered the beneficiaries the ability to vote on any such proposed measure.

Redemption of the preferred stock was a simple matter involving administration which furthered the stated purpose of the trust. The court itself noted the real objection of the beneficiary appeared to be that the change in investment could result in a change in income; but that was not the final test, rather the good faith conduct of the trustees was the determinative factor. We note that there was no evidence or allegation that the challenged transactions in *Flagg* resulted in any diminution of the corpus of the trust or that they were undertaken at anything other than full and fair value.[12]

In the present case, we are confronted by a horse of a different color. This case does not involve a simple matter of administration or the mere exercise of the trustee's power for discretionary business purposes. Rather, it presents us with actions by the trustee that fundamentally alter the very corpus of the trust—the voting rights held in trust for the beneficiaries.

The Voting Trust Agreement provides that the settlors would each assign and deliver his or her Class B stock certificates (which represent HFC's voting stock) to the trustee who shall cause the stock to be transferred to himself as voting trustee on the books of the corporation. The agreement further provides that the trust continue for a period of ten years from the date of creation. Upon termination, the agreement requires the trustee to surrender the Class B stock certificates to the settlors or their successors-in-

interest. Under the proposed amendments, the Class B stock would still be surrendered but the rights attached to each share would be radically diminished.

*Flagg* involved an open ended fiduciary obligation to provide income for the life of the trust beneficiary and upon her death to her children. The conflict of interest present in *Flagg* is consistent with the type of conflict that the testator would have contemplated and would have intended to be enforceable. In this case, the voting trust was limited in duration to a period of ten years. Despite the broad grant of authority to the voting trustee under the trust agreement, it seems implausible that the settlors either contemplated or intended that their future power to control the corporation could be so greatly circumscribed. It's equally as implausible that they would have ever even entered into such an agreement knowing that such could occur. We believe that such a radical structural transformation of the voting rights of the holders of the Class B voting stock should only take place with the approval of a majority of the Class B voting shares, with all shares being voted by their actual or beneficial owners and not the voting trustee.

Finally, *Flagg* emphasized that a conflict of interest, absent bad faith, cannot be allowed to set aside the intent of the testator manifested in his will (or in this case, the intent of the settlors manifested in the Voting Trust Agreement). In the present case, however, the trust terminates, by its own terms, after

---

**12.** The dissent would find *Flagg* controlling in this case and notes that the principles espoused in *Flagg* have been applied where a trustee voted, "in favor of corporate measures which diminished the voting strength of trust shares." We take exception with this statement, as the cases proffered in support of this statement do not undermine our analysis or conclusion that *Flagg* is not controlling.

The dissent relies principally on *In Re Steele's Estate*, 377 Pa. 250, 103 A.2d 409 (1954) and *In Re Pincus' Estate*, 378 Pa. 102, 105 A.2d 82 (1954). In neither of these cases, however, were the voting rights of the trust beneficiaries compromised for the benefit of the trustee. In *Steele*, the distribution of a stock dividend in kind to the income beneficiary decreased the voting strength of the trust, but it actually increased the voting power of the beneficiary.

In *Pincus*, there was no diminution in the voting strength of the stock held in trust for the

beneficiary. Testator held a minority interest in corporation. Actions of the trustee with respect to other shareholders ensured that the minority interest held by the trust could not be combined with other minority interests to gain control of corporation. The court concluded the trust continued to possess the same quantum of stock after the trustee undertook the challenged actions and also that the marketability and value of the stock had not been affected.

As to the remaining cases cited by the dissent, each involves the question of the distribution of a stock dividend to the income beneficiary. The issue of diminution of either the trust's or beneficiary's voting power was not at issue. In any event, a stock dividend in kind payable from the trust to the beneficiary would result in an increase and not a decrease in the beneficiary's voting power.

a period of ten years. The proposed amendments in this case were adopted less than one year prior to the voting trust's termination. The proposed amendments were an attempt, undertaken at the eleventh hour, to, in effect, perpetuate the trust and ensure John Warehime's continued control of HFC. *See e.g.* Fletcher, **Cyclopedia Corp.**, *supra* (voting trustees cannot elect themselves as directors for terms of office that would outlast the duration of the voting trust; the creation of a voting trust does not give the trustee the power to destroy the beneficial ownership interests in any manner). In view of all these considerations, we find that the rule enunciated in *Flagg* is inapplicable in this case and in factually similar cases.[13] As such, the rule of undivided loyalty and the limitation against self-dealing retain their full effect.

In view of the general principles involving voting trusts, the law of this Commonwealth and the public policy underlying a trustee's duty of loyalty, we cannot sanction the action of John Warehime voting the shares of the voting trusts in favor of the proposed amendments. The adoption of these amendments, while taken for the stated reasons of preserving the integrity of HFC's value and ability to function profitably, will, nonetheless, serve to perpetuate the control of the company by John Warehime for at least another five years and preclude the other shareholders, including the beneficiaries of the trust, from the ability and opportunity to make any meaningful decision concerning the management of HFC.

John Warehime has placed great emphasis on the fact that his primary duty is to the corporation and that his stewardship thereof has resulted in a financially successful company and great benefit to the company's shareholders. The argument that John Warehime's duty is to the corporation and not to the beneficiaries of the voting trust must fail, however, since the corpus of the voting trust and the ownership of the corporation are essentially the same. Even if we were to engage in the dubious proposition that duty to the corporation supersedes any duty to the trust beneficiaries, it must similarly fail since John Warehime, having won exclusive power to appoint the entire board of directors (who, having been so appointed, do not enjoy the status of "independent directors"), may not in fidelity to his trusteeship, exercise his executive power to perpetuate a plan whose sole instrumentation is to disenfranchise beneficiaries from their rightful empowerment as shareholders, who own a voice to participate in the affairs of the corporation.

We find the Fourth Circuit's decision in *Brown v. McLanahan*, 148 F.2d 703 (4th Cir.1945) instructive [14]. In *Brown*, one of the beneficiaries of a voting trust brought suit against the voting trustees, seeking to set aside an amendment to the company charter. Prior to the proposed amendment, all of the company's preferred and common stock (in which all the company's voting power was exclusively vested) was held by a voting trust, which was to terminate ten years after its creation. There existed 233,427 shares of preferred stock, representing one vote each; and when a dividend arrearage existed, the preferred stockholders had the exclusive right to elect all but one director. There existed 169,112 shares of common stock, three shares of which entitled the holder to one vote. The power to elect one director was exclusively vested in the common stock.

---

**13.** The dissent notes in footnote 1 that at the time the settlors created the voting trust, statutory law declared invalid and unenforceable a voting trust that did not contain a provision limiting the term of the trust to a period of ten years or less. *See* 15 P.S. § 1511 (1967)(repealed 1988). The Voting Trust Agreement in this case does specifically limit the Warehime trusts to ten years in duration, but does not reference § 1511. Whether or not the settlors would have extended the term of the trust beyond the ten year period, if the law so permitted, cannot be ascertained from the record. Contrary to the dissent's conclusion, we

find it significant that the settlors created the trust with the knowledge and intent that it would terminate after a period of ten years. It is a fair conclusion that perpetuation of control of HFC by the voting trustee was a matter that was neither intended nor contemplated by the settlors.

**14.** We note that *Flagg* was decided by our Supreme Court subsequent to the 4th Circuit's decision in *Brown*, which, in any event, did not implicate Pennsylvania law.

Without notice to the beneficiaries of the voting trust, the board of directors proposed, and the voting trustees adopted, an amendment to the company charter. This amendment: (1) eliminated the arrearage clause which provided for exclusive voting rights in the preferred stock; (2) granted voting rights to debenture holders, creating 221,000 new votes eligible to be cast on all corporate matters; and (3) as of the termination of the trust, the common stockholders would be deprived of their exclusive right to elect one director.

The plaintiff/beneficiary alleged an abuse of trust by the trustees, who, faced with the expiration of the voting trust, proceeded to amend the charter so as to retain control of the corporation by giving voting rights to the debentures. These debentures were either directly or indirectly owned or controlled by the voting trustees.

The court, in concluding that the action of the trustees was invalid because it constituted an abuse of trust stated:

> It is elementary that a trustee may not exercise powers granted in a way that is detrimental to the cestuis que trustent; nor may one who is trustee for different classes favor one class at the expense of another. Such an exercise of power is in derogation of the trust and may not be upheld, even though the thing done be within the scope of powers granted to the trustees in general terms. *See King v. Richardson*, 4 Cir., 136 F.2d 849, 859. It is well settled that the depositaries of the power to vote stock are trustees in the equitable sense, *Henry L. Doherty & Co. v. Rice*, C.C., 186 F. 204, 214, and a voting trust is a trust in the accepted equitable view. *H.M. Byllesby & Co. v. Doriot, Del. Ch.*, 12 A.2d 603; *Chandler v. Bellanca Aircraft Corp.*, 19 Del.Ch. 57, 162 A. 63; *Barbour v. Weld*, 201 Mass. 513, 87 N.E. 909.

*Brown*, at 706. Moreover,

> [t]he fact that the power to amend the charter was granted in general terms by the voting trust agreement does not authorize an amendment in derogation of the trust reposed in the trustees.

*Id.* at 707.

The court also commented that, although the trustees possessed broad authority to alter the capital stock in amount, classification and preference, such power does not grant unlimited authority to the trustees; it was beyond the powers vested in the trustees to diminish the voting power which they held in trust for the beneficiaries of the trust. The court reasoned that the voting strength of shares of stock is a property right meriting judicial protection and that even a broad grant of power to a voting trustee could not be construed as the grant of authority to diminish the value of the stock.

The court summed up these comments:

> [T]he grant of such powers for business purposes is not the equivalent of saying that the trustees may by unfettered action further their own interest at the expense, and to the clear detriment of their cestuis que trustent. It is settled that when the personal interests of a trustee conflict with the interests of his cestui, the interest of the trustee will fall.

*Id.* at 708.

Finally, the court rejected the trustee's defense of good faith:

> Defendants also set forth their honest belief that their actions were for the benefit of the Company.

> In this connection, the words of the Court in *Luther v. C.J. Luther Co.*, 118 Wis. 112, 94 N.W. 69, 73, 99 Am.St.Rep. 977, appear particularly apt. The Court there said:

>> "Nothing can be more fallacious in corporate or in popular government than the argument that because they honestly believe their policy right, and another dangerous, they may rightfully invade the field of the suffrage upon which policy rests, and disenfranchise, in whole or in part, those who disagree with them."

> Subjective good faith cannot lend validity to the acts of the trustees which operate to deprive the certificate-holders

of vital rights. *Industrial & General Trust v. Tod*, 180 N.Y. 215, 73 N.E. 7. *Id.* at 709.

In the present case, the court concluded that the action of John Warehime voting the trust shares in favor of the proposed amendments was in the best interest of all the shareholders of HFC, including the voting trust beneficiaries. It further concluded that the adoption of the proposed amendments benefited all shareholders because they created a stable governance structure which would allow the business to remain competitive and on a sound financial footing. We, however, cannot agree that the actions of John Warehime were not a breach of his fiduciary duties to the trust beneficiaries or that his private interests did not conflict with the beneficiaries' interests.

Although the record supports the trial court's finding that John Warehime voted the trust shares for the proposed amendments in the good faith belief that they were in the best interest of the company, such belief, *Flagg* notwithstanding, is irrelevant for purposes of our inquiry. The adoption of the proposed amendments directly benefited him by perpetuating his control, or substantially increasing the likelihood of his continued control, of the company well beyond the expiration of the voting trust. Moreover, his action worked to the detriment of the trust beneficiaries as it effectively diminished their voting power and virtually assured that they would be without any meaningful input with regard to the management of the corporation. We, therefore, conclude that John Warehime acted beyond the limit of his authority as voting trustee and breached his duty of loyalty to the trust beneficiaries. It follows that the court erred in refusing to grant an injunction against John Warehime voting in favor of the amendments to create a new class of dispute resolution stock.

Orders reversed. Case remanded for further proceedings consistent with this Opinion.

Jurisdiction relinquished.[15]

POPOVICH, J., files a Dissenting Opinion.

POPOVICH, J., dissenting:

Under Pennsylvania law, the fiduciary standard applicable in the present case is that of good faith. Therefore, I cannot join the majority in holding John Warehime to a duty of undivided loyalty.

The "legality of an agreement concerning the voting rights of corporate stock is to be adjudged by the law of the State of incorporation." *Deibler v. Chas. H. Elliott Co.*, 368 Pa. 267, 275, 81 A.2d 557, 561 (1951) (citations omitted). Our Business Corporation Law permits shareholders to enter into voting trust agreements and assures that the Commonwealth of Pennsylvania will respect the terms and conditions of such agreements:

> One or more shareholders of any business corporation may, by agreement in writing, transfer all or part of their shares to any person for the purpose of vesting in the transferee voting or other rights pertaining to the shares *upon the terms and conditions and for the period stated in the agreement.*

15 Pa.C.S.A. § 1768(a) (1988) (emphasis added); *accord* 15 P.S. § 1511(A) and (B) (1967) (repealed 1988). Nothing in § 1768 prohibits shareholders from creating a trust that alters the traditional fiduciary obligations of a trustee, which is precisely what the settlors of the Warehime Voting Trust did.

The controversy before this Court involves no more than a question of law, which requires for its resolution the proper interpretation of a written agreement. The second clause of the trust instrument empowers the trustee with the sole voting authority over the trust stock. Warehime Voting Trust, 4/5/88, p. 2 ("the Trustee shall be entitled to exercise all rights of every kind granted to the Stockholders except as such rights shall be specifically limited by the terms of this agreement ..."). The third clause of the trust instrument expressly defines and limits the trustee's duty to the beneficiaries. It provides:

> The Trustee will use his best judgment in voting upon the stock held by him, but

15. Due to our disposition of appellant's first issue, we need not address his remaining issues.

Additionally, in view of our decision herein, the appeal at 879 HBG 1997 is dismissed.

assumes no responsibility for the consequence of any vote cast, or consent given by him, in good faith, and in the absence of gross negligence.

Warehime Voting Trust Agreement, 4/5/88, at 2. This is clear, unmistakable and explicit language that limits the trustee's fiduciary obligation to one of good faith. Since the language of the voting trust is clear and unambiguous, we cannot overlook our obligation to enforce its terms. See In re Deed of Trust of McCargo, 438 Pa.Super. 570, 652 A.2d 1330, 1336 (Pa.Super.1994), reargument denied, appeal denied, 543 Pa. 693, 670 A.2d 141 (1995).

"It is old, settled law that persons may alter by express agreement the legal relationship they would normally have had by operation of law." Ress v. Barent, 378 Pa.Super. 397, 548 A.2d 1259, 1265 (Pa.Super.1988) (citing Germantown Trust Co. v. Stanley Co. of America, 338 Pa. 533, [536], 13 A.2d 406, 408 (1940)). When the parties to an agreement have chosen to address a particular aspect of their legal relationship by contract, it is the terms of the agreement, as manifestly expressed, that is to determine the rights and liabilities of the parties. See Ress, 548 A.2d at 1265 (citation omitted). Despite this Court's obligation to give effect to every word and clause in the trust instrument if reasonably possible, see In Re Grier's Estate, 403 Pa. 517, 525, 170 A.2d 545, 549 (1961), the majority ignores the exculpatory provision of the trust instrument, and, instead, superimposes a heightened standard of care upon the trustee, that of loyalty.

I cannot assent to this construction of the instrument as it renders the exculpatory clause of the instrument futile. See Stonehedge Square Limited Partnership v. Movie Merchants, Inc., 454 Pa.Super. 468, 685 A.2d 1019, 1025 (Pa.Super.1996), aff'd, 552 Pa. 412, 715 A.2d 1082 (1998); McCargo, 652 A.2d at 1337. From a policy standpoint, "[d]irectors and investors must be able to rely on the stability" of their agreements and "the absence of judicial interference" when those agreements "comply with the State's statutory prescriptions." Williams v. Geier, 671 A.2d 1368, 1385, n. 36 (Del.Supr.1996). Today, the majority introduces an undesirable degree of uncertainty into our corporate law and eviscerates accepted principals of corporate draftsmanship by disregarding the terms of the trust instrument and imposing its own set of obligations upon the trustee of the Warehime Voting Trust.[1]

This court has no authority to fashion a new and different agreement for the parties; our task is to interpret the agreement which they made for themselves. Stonehedge, 685 A.2d at 1025. If the parties had intended to limit the trustee's authority to vote their shares in any manner, then they would have included a provision that defined the specific subjects on which the trustee had unrestricted voting rights and those on which the trustee did not have such rights.[2] They chose not to do so. Instead, they granted the trustee virtually unrestricted voting powers, and the only limit placed upon the trustee was that he exercise such power in good faith.

The instrument complies with the statutory prescriptions for voting trust agreements and limits the trustee's duty to one of good faith. The majority has found that "the rec-

---

1. The majority relies upon the fact that the trust expired after a period of ten years to conclude that the settlors did not intend to authorize the trustee to vote upon a matter which would have an effect upon their shares after the expiration of the trust. At the time the settlors created the trust, a voting trust which did not contain a provision limiting the term of the trust to a period of ten years or less was invalid and unenforceable. See 15 P.S. § 1511 (1967) (repealed 1988); see also Christopher v. Richardson, 394 Pa. 425, 147 A.2d 375 (1959). Thus, the ten year provision in the trust reflects nothing more than the scrivener's desire to comply with the applicable laws extant when the trust was made. If we glean anything from this provision, it should be the settlors' intent to endow the trustee with the maximum authority then permitted under the business corporation law, as opposed to an intent to limit or circumscribe the power of the trustee.

2. For example, the parties could have vested the trustee with the right to vote for the election of directors and relatively routine matters such as the selection of auditors, but not for fundamental transactions of the type that give rise to dissenters' rights. In those situations where the trustee has no discretion to vote on certain subjects, the agreement should provide how the underlying shares will be voted.

ord supports the trial court's finding that John Warehime voted the trust shares for the proposed amendments in the good faith belief that they were in the best interest of the company." By casting the votes in good faith, John Warehime complied with the terms of the trust instrument. Such compliance shields his actions from judicial interference.

Moreover, even if the instrument had not included an exculpatory clause, this Court still would have an obligation to construe the contract in accordance with the common law, see Ress, 548 A.2d at 1265, and, under Pennsylvania common law, the fiduciary standard applicable to the Warehime trustee is one of good faith rather than absolute loyalty.

The majority correctly observes that in Flagg, our Supreme Court held the trustee to the standard of good faith rather than of undivided loyalty because the settlor of a trust had expressly approved of a trustee's conflict of interest arising from his dual roles as trustee under the trust and as an executive responsible for the direction and management of the company. See In Re Flagg's, 365 Pa. 82, 73 A.2d 411 (1950). Although conceding that here, as in Flagg, "the settlors of the Warehime Voting Trust contemplated and created an inherent conflict of interest for the voting trustee," the majority, relying upon Brown v. McLanahan, 148 F.2d 703 (4th Cir.1945), finds Flagg inapposite because the presently-contested transaction results in the diminution of the voting rights of the stock in trust. Our Supreme Court has made no such distinction and, indeed, has applied the principles espoused in Flagg to cases where the trustee voted, in his capacity as a trustee or as an officer of the corporation, in favor of corporate measures which diminished the voting strength of trust shares. See In Re Steele's Estate, 377 Pa. 250, 103 A.2d 409 (1954), overruled in part by In re Trust of Catherwood, 405 Pa. 61, 173 A.2d 86 (1961), overruled in part by In re Trust Estate of Pew, 411 Pa. 96, 191 A.2d 399 (1963); overruled in part by Estate of Tyler, 447 Pa. 40, 289 A.2d 441 (1972) and overruled in part by Estate of Tyler, 474 Pa. 148, 377 A.2d 157 (1977); see also In Re Pincus' Estate, 378 Pa. 102, 105 A.2d 82 (1954).

In Steele, the beneficiary of a testamentary trust challenged the trustee's vote in favor of a transaction that worked "substantial damage to the trust by reason of reducing its voting strength," on the grounds of, inter alia, the conflict of interest arising from the trustee's roles as an officer of the Easton Publishing Company, trustee of a trust holding 49% of the stock of the publishing company and beneficiary of the same trust.[3] See Steele, 377 Pa. at 253, 103 A.2d at 411. The court found Flagg to be directly on point and, accordingly, held the trustee to a standard of good faith despite dilution in the trust's voting strength.

In Pincus, the trustee exchanged his own, privately-held stock in a manufacturing corporation for the stock of a retail company. The beneficiary argued that the trustee violated his duty of loyalty in that he personally benefited, both as a manager of the business and as a beneficiary of the trust created, from the stock exchange and, at the same time, diluted the voting power of the trust and foreclosed any possibility of the beneficiary aligning with other shareholders and exercising voting control over the manufacturing corporation.[4] Pincus, 378 Pa. at 107,

---

3. Specifically, the beneficiaries objected to the distribution of a stock dividend from the trust on the grounds that Mrs. Fretz, whom the court earlier noted was "a life tenant under this trust, as well as co-trustee," Steele, 377 Pa. at 257, 103 A.2d at 412, in her capacity as one of the directors for the corporate trust company,

> voted for the stock dividend knowing she would receive it in kind, and knowing that the market value of the stock held in the trust as well as its so-called working voting control would be reduced.

Id., 377 Pa. at 257, 103 A.2d at 413. While the distribution did not reduce the number of shares held in trust, it did increase Beneficiary Fretz's voting power as an individual and correspondingly decrease the future voting power of the trust's other beneficiary, the appellant, St. John's Lutheran Church.

4. As the Court summarized,

> The gravamen of the present complaint of the petitioners is that Irwin Nat Pincus violated his duty of loyalty to the beneficiaries of decedent's estate in that he personally benefited by the stock exchange transactions, both as manager of the business and as beneficiary of the trust created by his father, and at the same time caused a corresponding detriment to the

105 A.2d at 85. Again, our Supreme Court applied *Flagg* and refused to disqualify the trustee from entering into the stock exchange transaction because "bad faith on the part of the fiduciary [was not] affirmatively shown." *Id.,* 378 Pa. at 102, 105 A.2d at 86.

Here, as in *Steele* and *Pincus,* "the most important, complete and controlling" reason to uphold the acts of the trustee is enunciated in *Flagg.* *Steele,* 377 Pa. at 257, 103 A.2d at 413. Indeed, the rationale espoused in *Flagg, Steele* and *Pincus* is even more compelling in the present case, where the parties have expressly provided that the trustee's actions will be measured under the good faith standard. The present trust instrument contemplates and sanctions the existence of a conflict of interest. Under such circumstances, the evidence of the conflict of interest does not *ipso facto* disqualify the trustee from voting in favor of the contested transaction. In order to effect such disqualification "bad faith on the part of the fiduciary must be affirmatively shown." *See Pincus,* 378 Pa. at 109, 105 A.2d at 86; *accord Flagg,* 365 Pa. 82, 73 A.2d 411; *Steele,* 377 Pa. 250, 103 A.2d 409.

Like the settlor in *Steele,* the settlors in the present case set no specific limitations on the trustee's authority other than an expressed desire that he exercise the rights therein entrusted "in accordance with his best judgment." Warehime Voting Trust at 2. There is no limitation in this paragraph— no indication that the trustee must preserve the voting power underlying the stock intact and without alteration until the termination of the trust, but, on the contrary, merely a desire that the shares be cast in the manner the trustee, in good faith, thinks proper. *See Steele,* 377 Pa. at 255, 103 A.2d at 412 (1954). If the settlors intended to prohibit the trustee from voting the trust shares in favor of proposals that diluted the voting strength of

the trust, then they should have included a provision to this effect in the voting trust agreement.

Our Supreme Court has held that the duty of good faith, rather than absolute loyalty, applies in cases where the settlor expressly approves the conflict of interest position; and, absent a contrary decision by that Court, it is the duty of this Court to adhere to that authority, *see Stonehedge,* 685 A.2d at 1026 (citation omitted), especially when, as in the case *sub judice,* the trust instrument expressly limits the trustee's culpability to actions taken in bad faith. The conferred right to exercise plenary powers of voting, combined with the effect of the exculpatory provisions of the instrument, necessarily modified or displaced the absolute duty of loyalty. The record supports the trial court's finding that John Warehime acted in good faith, and, accordingly, we should affirm its judgment. *See Flagg,* 365 Pa. 82, 73 A.2d 411; *Steele,* 377 Pa. 250, 103 A.2d 409; *Pincus,* 378 Pa. 102, 105 A.2d 82. Hence, I dissent.

---

beneficiaries of decedent's estate of which he was executor and trustee in that said beneficiaries were relegated to the position of a minority corporate interest without any possibility of combining with any other interest to acquire control of the corporation ... Petitioners complain that the transfer of Jacob's interest to Nathan has foreclosed the possibility of the Henry interest participating in any combination capable of exercising control. . . .

With respect to the other executor, Samuel A. Goldberg, Esquire, the complaint is that he made no effort to prevent the execution of the stock exchange agreement by or with Nat Pincus but, on the contrary, facilitated it, and that he knew or should have known that these agreements were detrimental to the best interests of the beneficiaries of decedent's estate. *Pincus,* 378 Pa. at 107, 105 A.2d at 85.