# Jewelcor Management Inc. v.
# Thistle Group Holdings Co.

*Thomas J. Elliott,* for plaintiff.
*Mark A. Klugheit,* for defendant.

HERRON, *J.,* March 22, 2002—

ORDER

And now, March 22, 2002, upon considering the respective positions of the parties, review of the verified complaint and plaintiff's petition for injunctive relief and accompanying memorandum of law, it is hereby ordered that:

(1) The annual meeting of the stockholders for Thistle Group Holdings Co., scheduled for April 3, 2002, is hereby enjoined;

(2) The annual meeting of the stockholders of Thistle Group Holdings Co., shall not be noticed for any date earlier than April 17, 2002.

It is further ordered that this order is conditioned upon plaintiff posting a bond in the amount of $500 as security for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Opinion to follow.

———————

Plaintiff Jewelcor Management Inc. has filed a petition for a preliminary injunction that would force defendant Thistle Group Holdings Co.[1] to move its annual shareholders' meeting from April 3, 2002, to April 17, 2002. For the reasons set forth in the following findings of fact, discussion and conclusions of law, the petition is granted, and the court has issued the injunction as requested.

## FINDINGS OF FACT

(1) Thistle Group Holdings Co. is a publicly traded Pennsylvania corporation that operates primarily through Roxborough Manyunk Bank.

(2) Jewelcor Management Inc. is a record owner of 500 shares of Thistle common stock. Pet. exhibit A.

(3) The Thistle bylaws state that its annual shareholders' meeting is to be held "on such date and time as may be determined by the board of directors and stated in the notice of such meeting." Def. mem. exhibit B, exhibit A §2.2. The bylaws also state that notice of the annual

———————

1. The action also names several of Thistle's directors as defendants in this matter.

meeting must be given at least 10 days before the meeting. *Id.* §2.4.

(4) On January 20, 2002, the Thistle board of directors determined that the 2002 annual shareholders' meeting would be held on April 17, 2002, with a voting period date of March 4, 2002. Def. mem. exhibit B ¶3.

(5) On January 23, 2002, Thistle informed ADP Proxy Services that the meeting would be held on April 17, 2002. Pl. reply exhibit D ¶2. ADP passed on this informal notice to certain banks and brokers who hold more than 71 percent of Thistle common stock on behalf of beneficial owners. Pl. reply exhibit C ¶6; pl. reply exhibit D ¶3.

(6) On February 13, 2002, JMI provided Thistle with notice that it was nominating three individuals (nominees) for election to the board at the meeting.[2] Pet. exhibit A.

(7) On February 15, 2002, Jeffrey Unger, an attorney and financial analyst with JMI, contacted D.F. King & Co., JMI's proxy service, to determine if the meeting date had been set. Compl. exhibit A ¶4. A representative of King informed Mr. Unger that ADP had stated that the meeting would be held on April 17, 2002, with a record date of March 4, 2002. Pl. reply exhibit B ¶4.

(8) Relying on the information obtained from ADP, King and JMI prepared a proxy solicitation schedule based on an April 17, 2002 meeting date. Pl. reply exhibit B ¶4; pl. reply exhibit C ¶4.

---

2. JMI ultimately reduced the number of nominees to two to comply with federal banking regulations.

(9) Thistle filed a preliminary schedule 14A[3] with the SEC on February 15, 2002. Def. mem. exhibit A ¶7. This filing did not indicate a date or location for the meeting. Def. mem. exhibit A, exhibit 3.

(10) On February 20, 2002, the board met and authorized moving the meeting to April 3, 2002. Def. mem. exhibit B ¶5. Thistle asserts that this move was orchestrated to avoid a lengthy proxy fight that would distract Thistle from focusing on core banking issues. *Id.*

(11) On February 25, 2002, five days after the board moved the meeting date, Thistle received notice that the Office of Thrift Supervision of the United States Department of Treasury (OTS), the bank's primary regulator, had scheduled its yearly safety and soundness examination to last from April 1, 2002, until May 10, 2002. Def. mem. exhibit B ¶7. OTS requested access to a range of Thistle and bank documents and representatives. *Id.* ¶8.

(12) Thistle filed its definitive schedule 14A with the Securities and Exchange Commission on March 12, 2002. Def. mem. exhibit A ¶8. This definitive filing announced a meeting date of April 3, 2002. *Id.* Thistle contemporaneously mailed its proxy materials to its shareholders. Def. mem. exhibit B ¶9.

(13) On March 13, 2002, Long reviewed Thistle's definitive schedule 14A and became aware of the April 3, 2002 meeting date. Compl. exhibit A ¶6.

(14) Responses to JMI's proxy solicitation will not be received until April 4, 2002, at the earliest. Tr. of March 22, 2002 oral arg. 28.

---

3. A "schedule 14A" is a securities filing that incorporates proxy solicitation materials.

(15) JMI has requested that the court issue an injunction enjoining the defendants from holding the meeting before April 17, 2002. Pet. 15.

## DISCUSSION

JMI has presented sufficient reasons for issuing the injunction. In short, the board's attempt to move the meeting date is a blatant attempt to manipulate the upcoming board election and to interfere with JMI's right to contest the election of Thistle's directors. Accordingly, the court has issued the injunction, which reschedules the meeting for no earlier than April 17, 2002.

To be entitled to a preliminary injunction, as governed by Pa.R.C.P. 1531, a petitioner must satisfy a four-part test:

(1) The petitioner has a clear right to relief;

(2) The preliminary injunction is necessary to prevent immediate and irreparable harm that cannot be compensated by monetary damages;

(3) A greater injury will result by refusing to issue the injunction; and

(4) The injunction will restore the parties to the status quo as it existed prior to the wrongful conduct.

See *Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981); *Greco v. Hazleton City Authority*, 721 A.2d 399, 401 (Pa. Commw. 1998).

### I. *JMI Has a Clear Right To Relief*

In determining a petitioner's right to a preliminary injunction, it is essential that "the activity sought to be

restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will generally not be awarded." *All-Pak Inc. v. Johnston,* 694 A.2d 347, 350 (Pa. Super. 1997) (citing *Singzon v. Department of Public Welfare,* 496 Pa. 8, 11, 436 A.2d 125, 127 (1981)). However, to demonstrate a "clear right to relief," a petitioner must show only that substantial legal questions must be resolved to determine the rights of the respective parties and need not prove the merits of the underlying claim. *Chmura v. Deegan,* 398 Pa. Super. 532, 535, 581 A.2d 592, 593 (1990). Specifically, "unlike a party seeking a permanent injunction, a party seeking a preliminary injunction is not required to establish his or her claim absolutely." *Boyle by Boyle v. Pennsylvania Interscholastic Athletic Association Inc.,* 676 A.2d 695, 699 (Pa. Commw. 1996). (citation omitted)

## A. Thistle's Conduct Was Not Illegal

Because Thistle is a Pennsylvania corporation, its internal affairs are governed by Pennsylvania corporation law. 15 Pa.C.S. §1102(a). Each Pennsylvania corporation is to have an annual shareholders' meeting "at such time as shall be provided in or fixed pursuant to authority granted by the bylaws." 15 Pa.C.S. §1755(a). Notice for an annual meeting at which no "fundamental change"[4]

---

4. "Fundamental changes" include mergers, amendments to the articles of incorporation and dissolutions. 15 Pa.C.S. §§1901-1992.

will be considered must be given at least five days in advance of the meeting. 15 Pa.C.S. §1704(b)(2).

Here, the bylaws vest the board with the authority to set the date of Thistle's annual meeting and require that at least 10 days' notice be provided to shareholders. This permits the board to set a meeting date as it sees fit. Additionally, by giving shareholders notice of the meeting prior to April 7, 2002, 10 days before the scheduled meeting date, Thistle complied with both the bylaws and Pennsylvania law.

JMI appears to argue that the board's action is illegal because it contravenes the earlier "notice" of the April 17, 2002 meeting date. This argument is doubly flawed. First, there is no indication the "notice" of the April 17, 2002 meeting date qualifies as "notice" as the term is defined. With regard to the April 17, 2002 meeting date, it appears that Thistle did nothing more than notify ADP, who passed word of the meeting date on to a substantial majority, but not all, of Thistle's shareholders. This does not jibe with the requirement in both the bylaws and 15 Pa.C.S. §1704(b)(2) that notice be sent to "each" shareholder. While the court is wary of allowing a defendant corporation to use its noncompliance with Pennsylvania business law as a shield to thwart the rights of its shareholders,[5] JMI has failed to provide a single case

5. In *First Union National Bank v. Quality Carriers Inc.,* 48 D.&C.4th 1 (2000), for example, the court held that a defendant corporation's own errors in carrying out a merger did not render the merger void ab initio, a result that would have been inequitable to the shareholders whose rights had been trampled in the merger process.

where a court found that informal notice to a proxy service company constituted "notice." Thus, the court cannot consider the notification of the April 17, 2002 meeting date, to be considered the full and complete notice of the meeting contemplated by Pennsylvania statute and the bylaws. Cf. *Sparkes v. Wright,* 377 Pa. Super. 374, 382, 547 A.2d 415, 419 (1988) ("[B]ecause of the misleading nature of the notice and the confusion generated by the distribution of the invalid mail ballots . . . the meeting of December 4, 1987, was properly declared a nullity.").

Even if the Thistle's January 23, 2002 contact with ADP could be considered "notice," there is no indication that moving the date of an annual meeting is illegal per se. Again, the court is unaware of any case law that categorically prohibits a board of directors from moving an annual meeting date once notice of that date has already been provided. In the absence of such supporting authority, the court must conclude that Thistle and the board did not engage in conduct that can be considered illegal.

## B. Thistle's Conduct Was Improper and Inequitable

Notwithstanding the court's conclusion that the board's actions were not illegal, the examination of JMI's complaints is not complete. A corporation's board of directors acts improperly when it manipulates a corporate election to perpetuate its own control of the corporation. Because the board's moving the meeting date amounts to little more than an effort to maintain domination over Thistle's operations, JMI has a clear right to relief.

There is little doubt that the right to vote for a corporation's directors is one of the paramount privileges afforded shareholders:[6]

"The right to vote is among the most fundamental rights of ownership of voting shares. . . . The right of voting stock is inseparable from the right of ownership. The one follows as a sequence from the other, and the right to vote cannot be separated from the ownership without the consent of the legal owner. . . .

"The right to vote helps ensure corporate democracy, the principle that the owners of a corporation should control the direction that their corporation takes. In the face of disagreements with management, shareholders' most basic alternatives are either to sell their shares or to vote in new directors. . . . In the context of corporations whose shares do not have a ready market, shareholders have suffered in their inability to cash out of investments they believe to be mismanaged. Thus, the principle that shareholders should be afforded the right to vote out directors who do not share their vision is all the more important." *Warehime v. Warehime,* 777 A.2d 469, 477-78 (Pa. Super. 2001) (citing, inter alia, *Blasius Indus. Inc. v. Atlas Corp.,* 564 A.2d 651 (Del. Ch. 1988)). (quotation marks omitted) See also, *Reifsnyder v. Pittsburgh Outdoor Advertising Co.,* 405 Pa. 142, 149 n.8, 173 A.2d 319, 322 n.8 (1961) ("The right to vote is often consid-

---

6. It is possible to draw a distinction between a shareholder's right to vote in a board election, on the one hand, and the shareholder's right to field candidates and to solicit proxy votes in that election. The court finds this distinction meaningless in this case and will treat JMI's right to solicit proxies and to field the nominees as concomitant with its voting rights.

ered a shareholder's most fundamental right."); William Meade Fletcher, 5 Fletcher Cyc. of the Law of Private Corps. §2025 (1996) ("[T]he right to vote is a right that is inherent in and incidental to the ownership of corporate stock, and as such is a property right.").

There appears to be strong support, albeit mostly from outside the Commonwealth, for granting injunctive relief where a corporation or its directors interfere with the fair election of directors. JMI cites a number of cases, primarily from Delaware, that discuss the importance of corporate democracy and shareholder elections in general terms. See *e.g., Giuricich v. Emtrol Corp.,* 449 A.2d 232, 239 (Del. 1982) ("The courts of this state will not allow the wrongful subversion of corporate democracy by manipulation of the corporate machinery or by machinations under the cloak of Delaware law."). It appears from these cases that tinkering with corporate elections to interfere with shareholders' electoral rights violates a director's fiduciary duty to shareholders and is enjoinable. In *Blasius Industries Inc.,* for example, the Delaware Chancery Court considered the plaintiffs' challenge to how an election of two directors had been conducted:

"One of the principal thrusts of plaintiffs' argument is that, in acting to appoint two additional persons of their own selection, including an officer of the company, to the board, defendants were motivated not by any view that Atlas' interest (or those of its shareholders) required that action, but rather they were motivated improperly, by selfish concern to maintain their collective control over the company. That is, plaintiffs say that the evidence shows there was no policy dispute or issue that

really motivated this action, but that asserted policy differences were pretexts for entrenchment for selfish reasons. If this were found to be factually true, one would not need to inquire further. The action taken would constitute a breach of duty." 564 A.2d at 658.

This theme also runs through the Chancery Court's decision in *Aprahamian v. HBO & Co.,* 531 A.2d 1204, 1206-1207 (Del. Ch. 1987):

"The corporate election process, if it is to have any validity, must be conducted with scrupulous fairness and without any advantage being conferred or denied to any candidate or slate of candidates. In the interests of corporate democracy, those in charge of the election machinery of a corporation must be held to the highest standards in providing for and conducting corporate elections." 531 A.2d at 1206-1207.

There is little case law in Pennsylvania on this subject. The only two Pennsylvania cases JMI cites are *Steinberg v. American Bantam Car Co.,* 76 F. Supp. 426 (W.D. Pa. 1948), and *Warehime.* In *Steinberg,* the corporation's bylaws set the annual shareholder meeting for the third Monday in September, but the directors repeatedly postponed the meeting. After the directors set the meeting for February of the next year and forwarded notice on January 24, they prevented the plaintiff from obtaining a list of shareholders. In granting the plaintiff preliminary injunctive relief, the court noted that the facts presented by the plaintiff, including the repeated moving of the meeting date, amounted to constructive fraud. While *Steinberg* helps JMI to the extent that it shows that moving a shareholder meeting date can constitute

improper conduct, the allegations here are distinguishable in that there was no repeated moving of the meeting date, and there is no evidence that the bylaws of Thistle required the meeting to be held on a specific date.

*Warehime* is marginally more similar to this case and revolved around a director-presented stock plan that would essentially have precluded removing the corporation's directors under all but the most unlikely circumstances. The incumbent directors themselves conceded that the proposed plan was designed to deter a change in control, with the court ultimately finding that they had "purposefully entrenched themselves." 777 A.2d at 480. Because of this, and in spite of the fact that the directors had not violated their fiduciary duties, the court held that the directors' conduct was improper and enjoined the plan from taking effect:

"While the business judgment rule does afford directors significant leeway in decisions that they make in good faith and with due care, and while directors may consider constituencies other than the shareholders, neither provision can validate corporate actions designed to undermine shareholder's voting rights.

"The directors' actions were improper, not because of a breach in duty to the corporation, but because of the principle of corporate democracy, the core issue in the present remand, which bars actions otherwise properly taken that are designed to undermine voting rights.

"We hold that John Warehime and the other directors impermissibly exercised their power to retain their own positions by purposely depriving the majority shareholders of any real opportunity to affect the outcome of any

vote. Such abuse of position, even if exercised in the belief that the company was thereby well served, violates the principles of corporate democracy that enable shareholders to control their own company. Therefore, we set aside the vote taken in favor of the stock plan." 777 A.2d at 480-81 & 480 n.13. (citations and footnotes omitted)

While *Warehime* generally supports JMI's position that interfering with a shareholder's voting rights is enjoinable, even where such conduct is not illegal or a breach of fiduciary duty, it is distinguishable from the case at hand. *Warehime* centered on the substance of the plan under consideration, not the process by which the meeting was scheduled and noticed. In contrast, the instant dispute involves why the board moved the meeting and how the board notified JMI of the changed meeting date.

More on point than either Pennsylvania case is *Schnell v. Chris-Craft Industries,* 285 A.2d 437 (Del. 1971). There, the board of directors amended the company's bylaws to allow the board to set the time and place for stockholders' meetings, and the trial court concluded that the board's motivation in setting a date for the meeting was to impede a dissident group of shareholders' ability to wage a proxy fight over the election of directors. The Delaware Supreme Court accepted these findings of fact, but held that the trial court's refusal to grant relief to the shareholders was in error:

"In our view, those conclusions amount to a finding that management has attempted to utilize the corporate machinery and the Delaware law for the purpose of perpetuating itself in office; and, to that end, for the pur-

pose of obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management. These are inequitable purposes, contrary to established principles of corporate democracy. The advancement by directors of the bylaw date of a stockholders' meeting, for such purposes, may not be permitted to stand.

"When the bylaws of a corporation designate the date of the annual meeting of stockholders, it is to be expected that those who intend to contest the re-election of incumbent management will gear their campaign to the bylaw date. It is not to be expected that management will attempt to advance the date in order to obtain an inequitable advantage in the contest." 285 A.2d at 439. (citation omitted)

Of particular significance in *Schnell* is the fact that, like *Warehime,* the defendants' actions were merely inequitable, not illegal, but nevertheless provided grounds for an injunction:

"Management contends that it has complied strictly with the provisions of the new Delaware Corporation Law in changing the bylaw date. The answer to that contention, of course, is that *inequitable action does not become permissible simply because it is legally possible.*

"Management relies upon *American Hardware Corp. v. Savage Arms Corp.,* 37 Del. Ch. 10, 135 A.2d 725, *aff'd,* 37 Del. Ch. 59, 136 A.2d 690 (1957). The case is inapposite for two reasons: It involved an effort by stockholders, engaged in a proxy contest, to have the stockholders' meeting adjourned and the period for the proxy contest enlarged; and there was no finding there of ineq-

uitable action on the part of management. We agree with the rule of *American Hardware* that, in the absence of fraud or inequitable conduct, the date for a stockholders' meeting and notice thereof, duly established under the bylaws, will not be enlarged by judicial interference at the request of dissident stockholders solely because of the circumstance of a proxy contest. That, of course, is not the case before us." 285 A.2d at 439. (emphasis added) (citations omitted) See also, *Lerman v. Diagnostic Data Inc.,* 421 A.2d 906, 913 (Del. Ch. 1980) ("[I]nequitable conduct by management cannot become permissible simply because it is legally possible . . . .").

Later cases have narrowed the holding of *Schnell.* See *e.g., Alabama By-Prods. Corp. v. Neal,* 588 A.2d 255, 258 n.1 (Del. 1991) (The principle espoused in *Schnell* "should be reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right."); *Martin Marietta Corp. v. The Bendix Corp.,* no. civ. a. 6942, 1982 WL 525140 at *7 (Del. Ch. September 19, 1982) ("*Schnell* . . . turned on the proposition that the action taken by incumbent management, although legally permissible, was inequitable and unfair under the circumstances . . . ."). However, the basic tenets of shareholder democracy and fairness that *Schnell* propounded remain sound law.

In this case, the court has no doubt that the board's moving of the meeting date from April 17 to April 3 is an intentional and improper infringement on JMI's rights as a shareholder to contest a board election. The OTS visit and examination could not have influenced the

board's decision, as Thistle was not aware of the examination until five days after it moved the meeting. Moreover, the board's assertion that it sought nothing more than avoiding a drawn-out proxy fight is difficult to believe. Rather, it appears that the board's action was a thinly veiled attempt to provide its slate of nominees with an advantage and to undermine JMI's election and proxy efforts. In addition, although Thistle's informal notice through ADP does not satisfy the statutory and bylaws requirements, it is significant that JMI relied on the board's initial meeting date determination to plan its election campaign and that the board was most likely aware of this reliance. Thus, the board's actions are inequitable and impermissible under Pennsylvania law.

The cases cited by the defendants are not to the contrary. In *In re Allegheny International Inc.,* no. 88-448, 1988 WL 212509 (W.D. Pa. May 31, 1988), for example, the court found that "under Pennsylvania law, courts of equity have jurisdiction to restrain the holding of a corporate election only where there has been a showing that a fair and honest election cannot be held because of unlawful conduct, fraud, violence, or similar abuses." 1988 WL 212509 at *4 (requiring a "compelling showing of need" to issue an injunction). Here, it is clear that a fair and honest election cannot be held on April 3, 2002, because of the board's abuses, and *Allegheny International* therefore supports the conclusion that an injunction is appropriate here.

In *Blasius,* the Delaware Chancery Court found that, once it is established that directors have acted with the primary purpose of impeding a stockholder's exercise

of her voting powers, "the board bears the heavy burden of demonstrating a compelling justification for such action." 564 A.2d at 661. Here, the board has failed utterly to demonstrate such a justification. Thus, JMI has shown that it has a clear right to have the original meeting date of April 17, 2002, restored.

## II. *JMI Will Suffer Immediate and Irreparable Harm*

To establish immediate and irreparable harm, a petitioner has the burden of showing that the harm cannot be remedied by damages, *Schaeffer v. Frey,* 403 Pa. Super. 560, 565, 589 A.2d 752, 755 (1991); *Churchill Corp. v. Third Century Inc.,* 396 Pa. Super. 314, 328, 578 A.2d 532, 539 (1990), and that damages "can be estimated only by conjecture and not by an accurate pecuniary standard." *West Penn Specialty MSO Inc. v. Nolan,* 737 A.2d 295, 299 (Pa. Super. 1999). In determining whether the harm in question can be remedied by damages, courts are to look not at past damage, but rather to "the unbridled threat of the continuation of the violation." *Id.* In addition, the harm in question must be "great" in nature. *Kimmel v. Lower Paxton Twp.,* 159 Pa. Commw. 475, 481, 633 A.2d 1271, 1274 (1993). Interference with a shareholder's election rights has been held to constitute immediate and irreparable harm by courts both inside and outside the Commonwealth. See *e.g., International Banknote Co. v. Muller,* 713 F. Supp. 612, 623 (S.D.N.Y. 1989) ("[C]ourts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain repre-

sentation on the board of directors."); *Treco Inc. v. Land of Lincoln Sav. & Loan,* 572 F. Supp. 1447, 1450 (N.D. Ill. 1983) ("Due to the impending time constraints imposed by the October 26, 1983 annual meeting, plaintiffs will suffer irreparable harm should the court refuse to grant immediate injunctive relief."); *Warehime,* 777 A.2d 469.

JMI alleges that allowing the meeting to proceed on April 3, 2002, will make it impossible for it to continue its proxy battle in favor of the nominees. Specifically, the advanced meeting date does not allow JMI sufficient time to send, to receive and to process its proxy materials. The court has little difficulty finding that JMI's inability to involve itself in the corporate election process and to solicit the proxy votes of other Thistle shareholders constitutes immediate and irreparable harm.

### III. *The Injunction Will Restore the Status Quo*

In granting a preliminary injunction, a court is required to "preserve the status quo, as it exists or previously existed before the acts complained of." *Smotkin v. Manhattan-Ward Inc.,* 363 Pa. Super. 597, 600, 526 A.2d 1223, 1225 (1987). The status quo to be preserved *is* "the last actual, peaceable and lawful noncontested status which preceded the pending controversy." *Valley Forge,* 493 Pa. at 501, 426 A.2d at 1129. Forcing the meeting to be held on April 17, 2002, or thereafter, would restore the status quo as it existed prior to the board's improper action in moving the meeting to April 3, 2002.

## IV. *Greater Injury Will Result From Refusing To Grant the Injunction Than From Denying the Injunction*

The fourth requirement for a court to grant a preliminary injunction is that there would be greater injury resulting from failing to grant the injunction than from granting the injunction. *DiLucente Corp. v. Pennsylvania Roofing Co.,* 440 Pa. Super. 450, 456, 655 A.2d 1035, 1037 (1995). In considering any injuries, "[t]here should be no balancing of convenience, but it should be clear that greater injury would be done by refusing it than in granting it." *Pennsylvania Railroad Co. v. Driscoll,* 330 Pa. 97, 101, 198 A. 130, 133 (1938).

The defendants contend that moving the meeting will harm them by allowing JMI to advance positions that are harmful to Thistle and the bank and by interfering with the examination. However, there is no indication that OTS's visit will be less disruptive on April 3 than on April 17.[7] Moreover, the supposed harm caused by JMI's underlying proposals that the bank be sold or merged does not justify denying an injunction; a corporation's directors may not muzzle a shareholder simply because they deem the shareholder's views to be bad. Instead, the directors must engage in a dialogue and debate with the shareholder that allows them to exercise their rights

---

7. Indeed, the opposite may be inferred, as it is likely that bank officials will be far more occupied with OTS on April 3, 2002, the third day of the examination, than on April 17, 2002, midway through the examination.

as shareholders. Accordingly, there is greater harm in denying the injunction than in granting it.[8]

## CONCLUSIONS OF LAW

(1) JMI has a clear right to have the meeting moved to a date no earlier than April 17, 2002.

(2) JMI will suffer immediate and irreparable harm if the injunction is not granted.

(3) The harm JMI will suffer if the court refuses to issue the injunction is greater than the harm the defendants will suffer if the court issues the injunction.

(4) The injunction will restore the status quo as it existed prior to the defendant's wrongful conduct.

(5) These conclusions require that the court grant the petition and issue the injunction.

---

8. Before an injunction may be issued and effective, a petitioner is required to post a bond in an amount to be determined by the court. Pa.R.C.P. 1531(b); *Berger by and through Berger v. West Jefferson School District,* 669 A.2d 1084, 1085-86 (Pa. Commw. 1995). In determining the amount of the bond, the trial court is to balance the equities involved and "require a bond which would cover damages that are reasonably foreseeable." *Greene County Citizens United by Cumpston v. Green County Solid Waste Authority,* 161 Pa. Commw. 330, 337, 636 A.2d 1278, 1281 (1994). The $500 bond to be posted by JMI is sufficient to sustain the injunction.